**Supreme Court**

No. 2014-216-C.A.

(N2/13-18A)

State                          :

    v.                         :

Alicia Williams.               :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                 :

v.                 :

Alicia Williams.          :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.** The defendant, Alicia Williams (Williams or defendant), appeals her conviction of one count of assault with a dangerous weapon following a jury trial. On appeal, the defendant presents two claims of error: (1) that the trial justice improperly excluded testimony from one of the responding police officers which concluded that the defendant was afraid of the complaining witness; and (2) that the trial justice erred in denying her motion for a new trial. This matter came before the Supreme Court on February 25, 2016, pursuant to an order directing the parties to appear and show cause why the issues raised should not be summarily decided. After hearing the arguments of counsel and reviewing the memoranda submitted on behalf of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time without further briefing or argument. For the reasons set forth herein, we affirm the Superior Court's judgment of conviction.

**I**

**Facts and Travel**

The defendant's conviction arises from an incident that occurred on the afternoon of August 10, 2012, between her and the complaining witness, Rick Butler (Butler). At that time,

-1-

Butler and defendant were living with defendant's mother, Brenda Washington, who is Butler's cousin, and defendant's sister, G'tobia Washington,[1] in a three-story, townhouse-style apartment located at 214 Hillside Avenue in Newport, Rhode Island.[2] Brenda and defendant each occupied separate bedrooms on the second floor of the apartment and shared the second-floor bathroom, while Butler and G'tobia each occupied separate bedrooms on the third floor and shared the third-floor bathroom.

As Butler tells the story, on the afternoon of the altercation, he was between shifts at his jobs at Burger King and Walmart. He was in a hurry and wanted to take a shower, but both bathrooms were occupied—the second-floor bathroom by defendant and the third-floor bathroom by G'tobia. Butler testified that he asked Brenda if she could "talk to one of the girls and let [him] use the restroom" so he could get ready for work. Brenda went upstairs to ask defendant how much longer she would be occupying the bathroom, to which she responded: "Not too long, Mom." According to Butler, fearing that he would be late, he reluctantly opted to skip the shower and instead decided to just put on his uniform and go to his shift at Walmart. Butler further testified that at this point, he told G'tobia that he felt as though he "was being nit-picked" and that the sisters had set him up to be late by purposely occupying both bathrooms at a time when they knew he needed to get ready for work.

According to Butler, an argument then ensued between him and defendant on the second-floor "landing area" of the apartment. Butler testified that defendant put her hand in his face twice and that, at one point, her hand "touched his nose." Butler "removed" defendant's hand from his face, and the two "got into it." Butler testified that defendant pushed him, he pushed her back, and then defendant "left the scene and went in her room and came out with a box cutter

---

[1] To avoid confusion, we will refer to Brenda and G'tobia by their first names.
[2] Butler moved in with Washington in late 2011.

* * * and started just swinging it." Butler went on to testify that defendant was "just like cutting * * * just was going everywhere" and demonstrated for the jury a "vigorous slashing motion." Butler testified that he felt a cut across his left bicep and inner forearm. He stated that the incident ended shortly thereafter because G'tobia had called the police.

Butler added that the police took a photograph of the cut on his forearm and that this was the only photograph of his injuries taken at that time. Butler testified that afterwards, he left the house to go to Walmart to explain to his managers what had transpired. After leaving Walmart, Butler testified that he came back to the apartment and then took a walk "to clear [his] mind." He then went back home, went upstairs to take a "bath;" and, "when [he] went into the bathroom, [he] noticed that there was a big gash up on [his] arm." Thereafter, Butler took Brenda's cell phone, walked up the street, and called the police, who arrived that evening and took a photograph of the newly-discovered cut on his left bicep.

Aside from Butler, the state called only one other witness, Officer Stephen Carrig (Officer Carrig) of the Newport Police Department, who, along with another officer, initially responded to the altercation. Officer Carrig testified that he spoke to "all the parties involved," including both Butler and defendant, and photographed the scene, Butler, and defendant. Officer Carrig further stated that he was also one of the officers who responded to Butler's call later that evening.

G'tobia, Brenda, and defendant all testified for the defense. G'tobia took the stand first. She testified that, at the time of the incident, Butler had not been getting along with anyone in the house. She recounted that, on the day of the incident, Butler was upset because defendant went to his place of work and took the car that they shared because she needed to use it. She testified that, after Butler came home from work that afternoon and after she thought he was done using

-3-

the third-floor bathroom, she went into the bathroom to take a shower. She then recalled that Butler came upstairs and started banging on the door, saying he needed to use the bathroom. She said she tried to calm him down by indicating she would be out of the bathroom soon, but that Butler kept banging on the door saying, "[t]hese bitches, they keep playing * * * I'm going to show them I'm not playing." G'tobia recounted that she came out of the bathroom shortly thereafter and saw Butler and defendant "arguing back and forth"—defendant was standing in front of the closet doors on the second floor, and Butler was standing on the second step going up to the third floor.

She testified that Butler turned the altercation into a physical one when he "jumped" on defendant and was "just punching her." G'tobia stated that defendant "started to fight back" and hit Butler and that Brenda tried to break up the altercation. After deducing that Brenda was not going to be able to break up the fight, G'tobia stated that she went into Brenda's room to call the police. G'tobia testified that she never saw defendant holding a box cutter, but that she heard a box cutter was involved and relayed that over the phone to the police dispatcher. She stated that she did not see any injuries on Butler and that the altercation ended shortly after she announced the police were on their way.

Brenda was the next to testify, and she too stated that Butler was not getting along very well in her home, especially with her daughters. Her version of events was similar to that of G'tobia's and also indicated that it was Butler who turned the altercation physical. She testified that she saw defendant with a box cutter and that defendant cut Butler on the arm when "he [went to] swing at her face again[.]" She further narrated that, after the police had come and gone, she gave Butler a ride to Walmart, picked him up about ten minutes later, and when they returned home, he asked to borrow her cell phone and left the house. She stated that when Butler

-4-

returned, he first went upstairs, and then came back downstairs and told her "I just found another cut on me[.]"

The defendant was the last to take the stand. She testified that, on the afternoon in question, Butler was banging on the door of the third-floor bathroom while G'tobia was occupying it. The defendant recalled that she tried yelling up the stairs to calm Butler down and that, in response, Butler ran down the stairs "charging at [her]" and "got in [her] face and started yelling at [her]." The defendant next testified that "out of nowhere" Butler punched her in the face and she pushed him in an effort to get him off her. She further stated that, during the altercation, her back was to her bedroom door and, at some point, Butler "pushed [her] or punched [her]" and she "kind of * * * lost [her] balance." The defendant said that, when she regained her balance, she saw the box cutter[3] within arm's reach on her bedroom dresser, grabbed it, and swung it at Butler because she thought "he'd get out of [her] face and leave [her] alone." The defendant testified that she saw two cuts on Butler's forearm, but did not see them until after the police arrived and the altercation had ended.

After the defense rested, the trial justice—without objection from either party—instructed the jury, including an explanation of the law as it pertained to self-defense and the duty to retreat.[4] On February 11, 2014, the jury found defendant guilty of the charge of assault with a dangerous weapon, a box cutter.

The defendant filed a motion for a new trial, arguing that the jury's verdict was against the weight of the evidence. Defense counsel argued that the motion was not a typical "pro forma motion" for the purposes of appeal, but that "[t]he jury got [it] wrong." The defense relied on the

---

[3] The defendant testified that she used the box cutter at her job at Walmart.
[4] During deliberation, the jury submitted a specific question regarding the law of self-defense and the duty to retreat. In response, the parties agreed that the trial justice would reread the self-defense instruction that had been previously given.

question the jury asked during deliberation that related to the retreat doctrine to support its contention that the jury "did not buy [Butler's] testimony in toto"—specifically, the portion of his testimony that suggested defendant was the initial aggressor. In ruling on the motion, the trial justice noted that it was undisputed that defendant was "wielding" a box cutter and that Butler was in fear for his safety at that time. He also noted that, while portions of Butler's testimony "stretch[ed] his credibility[,]" the jury was entitled to disregard those portions it considered non-believable and credit those portions it found to be believable. As such, the trial justice found that the portions of Butler's testimony the jury found to be believable supported a conviction of felony assault, and he denied defendant's motion.

On April 21, 2014, defendant was sentenced to five years imprisonment, suspended, with five years of probation.[5] A judgment of conviction was entered on April 24, 2014; defendant filed a timely notice of appeal.

## II

### Standards of Review

"We will not disturb a trial justice's evidentiary ruling without first determining that the ruling constitutes a clear abuse of his or her discretion." State v. St. Michel, 37 A.3d 95, 100 (R.I. 2012) (quoting State v. Johnson, 13 A.3d 1064, 1066 (R.I. 2011)). "Furthermore, this Court will not disturb the trial justice's ruling unless the abuse of discretion resulted in prejudicial error." Id.

With regard to defendant's motion for a new trial, "when a defendant contends that the verdict is against the weight of the evidence, the trial justice must sit as 'the legendary thirteenth juror,' exercising his or her independent judgment in weighing the evidence and passing on the

---

[5] The defendant was also ordered to complete batterers' intervention training, and a no contact order was issued between her and Butler.

-6-

witnesses' credibility." State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011) (quoting State v. Clark, 974 A.2d 558, 569 (R.I. 2009)). "If the trial justice agrees with the jury's verdict or determines that reasonable minds could disagree about the outcome, then he or she must deny the new-trial motion * * *." Id. "[W]e will not disturb a trial justice's decision with respect to a motion for a new trial unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." State v. Mendez, 116 A.3d 228, 247 (R.I. 2015) (quoting State v. Hie, 93 A.3d 963, 975 (R.I. 2014)).

## III

## Analysis

On appeal, defendant raises two issues. First, she claims that the trial justice abused his discretion by not allowing Officer Carrig to testify that she was "scared" of Butler, which she argues was "extremely relevant" to her defense. She also claims that the trial justice erred in denying her motion for a new trial. We discuss each claim of error in turn.

## A.  Officer Carrig's Testimony

On cross-examination, Officer Carrig was questioned about defendant's demeanor on the day of the altercation. Officer Carrig testified that defendant was "cooperative" and that she "wasn't agitated." When Officer Carrig stated that he "d[id not] recall" any other observations pertaining to defendant's demeanor, defense counsel attempted to refresh his recollection by having him review a copy of the Domestic Violence & Sexual Assault/Child Molestation (DV/SA) form that was filled out by another officer in connection with the incident. When he was asked if the DV/SA prompted any further recollection as to defendant's demeanor on the day of the altercation, the state objected. The trial justice then heard the attorneys at sidebar. As

grounds for the objection, the state argued that the DV/SA form included the phrase "scared of Butler[,]" which the state posited did not refer to the officer's observation of defendant's demeanor, but rather memorialized a statement defendant made to the reporting officer. The trial justice indicated that the statement was a conclusion either based on Officer Carrig's observations or based on a statement made by defendant, and that, if it were the latter, then the statement was inadmissible hearsay under State v. Harnois, 638 A.2d 532 (R.I. 1994). Nevertheless, the trial justice gave defense counsel the opportunity to lay a foundation for the admissibility of Officer Carrig's testimony that defendant was "scared of Butler."

Defense counsel then tried to broach the topic of how Officer Carrig came to the conclusion that defendant was scared, and the state lodged another objection. The jury was removed from the courtroom, and a voir dire of the witness commenced. During the voir dire, Officer Carrig confirmed that he did not fill out the DV/SA form; rather, his colleague, Officer Nick St. Lawrence (Officer St. Lawrence), completed the form, and he was not consulted. Officer Carrig also testified that he did not recall seeing Officer St. Lawrence fill out the form. Defense counsel asked Officer Carrig if reviewing the form helped him to recall that defendant "was scared of Mr. Butler," to which Officer Carrig responded in the affirmative. Officer Carrig testified that he came to this conclusion based in part on defendant's body language and the way she was acting, but also that he could not recall if his conclusion was based on "physical signs [of fear] or if she verbally stated it."

The state fleshed out its objection to Officer Carrig's testifying that defendant was "scared of Butler" and argued that, absent an accompanying statement, one's body language or demeanor alone does not indicate fear of a particular individual or object. The trial justice determined that Officer Carrig's recollection had not been refreshed by the DV/SA form because

he could not remember whether the statement "scared of Butler" was derived from defendant's demeanor and/or an accompanying verbal statement, and he ultimately disallowed the testimony.

The jury returned, and defense counsel continued to ask Officer Carrig about defendant's demeanor based solely on his observations and not on any statements made by defendant. Officer Carrig stated that defendant "was upset and seemed to be pretty nervous." When defense counsel pressed and asked if defendant "was nervous because Mr. Butler was still in the house[,]" the state objected, and the trial justice sustained the objection on the basis of lack of personal knowledge. Officer Carrig's testimony concluded shortly thereafter.

On appeal, defendant argues that the trial justice was "misguided" in thinking that Officer Carrig's testimony that she was "scared of Butler" was inadmissible hearsay and implicated our holding in Harnois. In that case, we held that a defendant who did not testify and was not subject to cross-examination could not then "manipulate[]" the rules of evidence by introducing exculpatory statements he made through the testimony of police officers via the "catchall" exception to the hearsay rule, Rule 803(24) of the Rhode Island Rules of Evidence. Harnois, 638 A.2d at 535-36. Here, defendant argues that Officer Carrig's testimony that she was "scared of Butler" was not based on a statement she made, but rather was based solely on Officer Carrig's observations of her demeanor following the altercation. However, despite being given ample opportunity to do so, defense counsel failed to lay a foundation to demonstrate that Officer Carrig knew defendant was scared of Butler specifically and that his conclusion was based solely on his observations.

To begin, we note that Officer Carrig was permitted to testify as to what he observed following the altercation, which included any observations pertaining to defendant's demeanor. See State v. Bruskie, 536 A.2d 522, 522, 523 (R.I. 1988) (state troopers permitted to testify as to

their observation that a defendant suspected of driving under the influence appeared to be "belligerent" and "dis-arranged").  Indeed, he testified without objection that defendant was "cooperative" and "wasn't agitated[;]" and, likewise, he was permitted to testify that she appeared "upset" and "nervous."  Officer Carrig's testimony became problematic, though, when he attempted to identify Butler as the source of defendant's fear.

We have said that "a witness may not give an opinion as to the inner thoughts or feelings of another person * * *."  State v. Covington, 69 A.3d 855, 866 (R.I. 2013);  see State v. Ellis, 619 A.2d 418, 423 (R.I. 1993) ("[I]t can scarcely be contended that in the ordinary course of events a lay witness is able to determine such inner feelings as might arise if a person was threatened.  This is a question that a lay witness (and probably most expert witnesses) would be totally unqualified to answer.").  That afternoon, defendant could have exhibited an "upset" or "nervous" demeanor for any number of reasons, not the least of which being that the police were in her mother's home as a result of a violent altercation she was involved in.

Despite being given leeway to do so, defense counsel declined to ask any questions to elicit specific observations made by Officer Carrig that would support his conclusion that the source of defendant's nervousness or fear was Butler.  Additionally, Officer Carrig testified that he could not recall whether his conclusion that defendant was "scared of Butler" was based on physical signs of fear or based on a statement made by defendant.  He also testified that he did not author the DV/SA form, nor was he consulted during the process.[6]  As such, it is questionable that Officer Carrig knew that defendant was in fact scared of Butler in particular. See Rule 602 of the Rhode Island Rules of Evidence ("A witness may not testify to a matter

---

[6] To be sure, the fact that Officer Carrig did not author the DV/SA form does not bar the defense from using it to refresh his recollection.  See State v. Presler, 731 A.2d 699, 704 (R.I. 1999) (noting that "any writing or object may be used in an effort to refresh a witness's recollection * * *" quoting State v. Souza, 708 A.2d 899, 903 (R.I. 1998)).

-10-

unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Accordingly, we conclude that the trial justice did not abuse his discretion in barring the testimony.

**B. Motion for a New Trial**

The defendant next argues that the trial justice erred in denying her motion for a new trial because he overlooked and misconceived material evidence by failing to evaluate the credibility of the witnesses and failing to address her self-defense argument. She also takes issue with the fact that the trial justice "disposed of [her] motion for new trial in only six pages of transcript." However, we have said that "[i]n setting forth the rationale for a decision [on a motion for a new trial], 'the trial justice need not refer to all the evidence supporting the decision,' rather he 'need only cite evidence sufficient to allow this [C]ourt to discern whether the trial justice applied the appropriate standards.'" State v. Swiridowsky, 126 A.3d 436, 442 (R.I. 2015) (quoting State v. Kizekai, 19 A.3d 583, 589 (R.I. 2011)). We "accord[] great weight to a trial justice's ruling on [such a motion] if he or she has articulated sufficient reasoning in support of the ruling." Id. (quoting Kizekai, 19 A.3d at 589).

We are satisfied that the trial justice articulated such reasoning in denying the defendant's motion for a new trial and that he applied the appropriate standard. He correctly assumed the role of the "legendary thirteenth juror," and exercised his independent judgment when weighing the evidence and assessing the credibility of the witnesses. Karngar, 29 A.3d at 1235 (quoting Clark, 974 A.2d at 569). The trial justice's decision includes a fairly extensive review of the testimony presented by both sides, and ultimately found that the jury "followed the evidence and

followed the law as given to it by [the court]."[7] While he noted that portions of Butler's testimony "stretch[ed] his credibility," he concluded that the jury was nevertheless "entitled to disregard that portion [of Butler's testimony] which they found was non-believable, but accept that portion that was believable." The defendant has not convinced us that the trial justice overlooked or misconceived material evidence or that he otherwise clearly erred. Thus, we decline to disturb his ruling. See Mendez, 116 A.3d at 247.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be returned to that tribunal.

---

[7] The defendant also argues that the jury instruction given with regard to her duty to retreat was incorrect. However, the record reveals that defense counsel failed to object to the instruction at the time it was given and even agreed to the same instruction being reread in response to a question submitted by the jury. As such, we need not address this assignment of error. See State v. Whitaker, 79 A.3d 795, 806 (R.I. 2013) (objections to a jury charge that are raised for the first time on appeal are deemed to be waived).



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**   State v. Alicia Williams.

**CASE NO:**   No. 2014-216-C.A.
(N2/13-18A)

**COURT:**   Supreme Court

**DATE OPINION FILED:**   April 11, 2016

**JUSTICES:**   Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**   Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**   Newport County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Edward C. Clifton

**ATTORNEYS ON APPEAL:**

For State:   Allison E. Krause
Department of Attorney General

For Defendant:   Camille A. McKenna
Office of the Public Defender